# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANDRES MASQUEDA SERRANO,<br>Plaintiff,<br>v.<br>RUDAS, *et al.*,<br>Defendants. | Case No. 1:22-cv-00950-KES-BAM (PC)<br>FINDINGS AND RECOMMENDATIONS REGARDING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT<br>(ECF No. 55)<br>**FOURTEEN (14) DAY DEADLINE** |

## I. Introduction

Plaintiff Andres Masqueda Serrano ("Plaintiff" or "Serrano") is a state prisoner proceeding *pro se* in this civil rights action pursuant to 42 U.S.C. § 1983. This action proceeds on Plaintiff's Eighth Amendment deliberate indifference to serious medical needs claim against Defendant Dr. R. Rudas for discontinuing pain medication.[1]

Currently before the Court is Defendant's motion for summary judgment on the grounds that Defendant did not violate Plaintiff's Eighth Amendment rights and that Defendant is entitled to qualified immunity, filed December 1, 2025. (ECF No. 55.)[2] Plaintiff opposed the motion on March 26, 2026. (ECF No. 62.) Defendant replied on April 6, 2026. (ECF No. 63.)

The motion is deemed submitted. Local Rule 230(l).

For the reasons set forth below, the Court will recommend that Defendant's motion for

[1] The case was reassigned to the undersigned on January 28, 2026. (ECF No. 58.)

[2] Concurrent with this motion, Plaintiff was provided with notice of the requirements for opposing a motion for summary judgment. *See Woods v. Carey*, 684 F.3d 934 (9th Cir. 2012); *Rand v. Rowland*, 154 F.3d 952, 957 (9th Cir. 1988); *Klingele v. Eikenberry*, 849 F.2d 409, 411-12 (9th Cir. 1988). (ECF No. 55-2.)

summary judgment be granted.

## II. Plaintiff's Allegations

Plaintiff states that in 2008 "Dr. Bozic[ 1 ] performed a hinged TKA" negligently, leading to his severe pain in 2009 and a corrective surgery on his right leg. (Doc. 1 at 3.) He asserts the "femoral component was grossly loose and was removed." (*Id.*)

Plaintiff contends that while he was incarcerated at Mule Creek State Prison in 2018, he submitted health care request forms advising Defendant Rudas he was in severe pain. (Doc. 1 at 3.) On June 12, 2018, Plaintiff was seen by orthopedic surgeon Casey who found Plaintiff was unable to bear weight on his right leg, noting "concern for hardware malfunction." (*Id.* at 3-4.) The surgeon requested an orthopedic surgery consultation for further evaluation "and guidance in management, including possible surgical intervention." (*Id.* at 4.) Plaintiff asserts that on June 15, 2018, he reported to "Dr. Matharu" that he was unable to sleep and could not perform his daily activities. (*Id.*) They discussed Dr. Casey's findings and Dr. Matharu advised Plaintiff he would prescribe pain medication. (*Id.*) When the prescription for pain medication expired, Plaintiff alleges he sent another health care request to Defendant Rudas on August 13, 2018. (*Id.*) Plaintiff then learned that although Rudas had never examined Plaintiff, Rudas discontinued the prescription. (*Id.*) On October 15, 2018, after many health care requests, Plaintiff was seen by Defendant Rudas. (*Id.*) Plaintiff advised Rudas of his severe pain, inability to sleep, swelling, and inability to complete his daily activities. (*Id.* at 4-5.) He requested pain medication. (*Id.* at 5.) During an examination of his knee, Plaintiff advised Rudas he had fallen in the shower and that "most of the time" he cannot get to chow hall to eat. (*Id.*) Plaintiff advised Rudas that if he did not receive "helpful medical treatment" or "helpful medication," he intended to file a grievance or appeal against Defendant Rudas. (*Id.*) Plaintiff asserts Rudas then asked him to leave. (*Id.*) Plaintiff contends Rudas knowingly and willingly denied him "helpful medical treatment." (*Id.*)

Plaintiff alleges that on October 23, 2018, he saw Defendant Rudas again and advised him of his severe pain and that "the creams and other medication" were not helpful. (Doc. 1 at 5.) Plaintiff advised Rudas that his leg was "swollen bad," that he could not sleep and could not complete his daily activities. (*Id.*) Plaintiff also advised Rudas the previous pain medication had been helping and asked why it had been discontinued. (*Id.*) He contends Rudas told him he would not prescribe morphine for Plaintiff's pain. (*Id.*) When Plaintiff stated to Rudas he was in "severe chronic pain" and repeated his request for helpful pain medication or medical treatment, Rudas told Plaintiff they were finished and refused to prescribe pain medication or additional treatment. (*Id.* at 5-6.)

On November 7, 2018, Plaintiff was again seen by Defendant Rudas. (Doc. 1 at 6.) He advised Rudas the medication Rudas ordered "did not work." (*Id.*) Plaintiff contends despite seeing that his leg was swollen, Rudas refused to prescribe any helpful pain medication or medical treatment. (*Id.*)

On December 3, 2018, when Plaintiff "could not walk at all," he was taken to the clinic and seen by Defendant Rudas. (Doc. 1 at 6.) Plaintiff's leg was swollen, and he was in severe pain. (*Id.*) Plaintiff contends Rudas "only wanted to know why [Plaintiff] did not go to [his] medical appointment[s]." (*Id.*) Plaintiff advised Rudas he was in too much pain. (*Id.*) He contends Rudas knew he was in severe pain and "may even lose his leg," but continued to refuse to provide any helpful medical treatment or pain medication. (*Id.* at 6-7.)

(*See* ECF No. 17 at 3-5.)

**III. Motion for Summary Judgment**

Summary judgment is appropriate when the pleadings, disclosure materials, discovery, and any affidavits provided establish that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one that may affect the outcome of the case under the applicable law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Id.*

The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The exact nature of this responsibility, however, varies depending on whether the issue on which summary judgment is sought is one in which the movant or the nonmoving party carries the ultimate burden of proof. *See Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). If the movant will have the burden of proof at trial, it must "affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Id.* (citing *Celotex*, 477 U.S. at 323). In contrast, if the nonmoving party will have the burden of proof at trial, "the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case." *Id.*

If the movant satisfies its initial burden, the nonmoving party must go beyond the allegations in its pleadings to "show a genuine issue of material fact by presenting affirmative evidence from which a jury could find in [its] favor." *F.T.C. v. Stefanchik*, 559 F.3d 924, 929 (9th Cir. 2009) (emphasis omitted). "[B]ald assertions or a mere scintilla of evidence" will not suffice in this regard. *Id.* at 929; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) ("When the moving party has carried its burden under Rule 56[], its opponent must do more than simply show that there is some metaphysical doubt as to the material

facts.") (citation omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting *First Nat'l Bank of Arizona v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

In resolving a summary judgment motion, "the court does not make credibility determinations or weigh conflicting evidence." *Soremekun*, 509 F.3d at 984. Instead, "[t]he evidence of the [nonmoving party] is to be believed, and all justifiable inferences are to be drawn in [its] favor." *Anderson*, 477 U.S. at 255. Inferences, however, are not drawn out of the air; the nonmoving party must produce a factual predicate from which the inference may reasonably be drawn. *See Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898 (9th Cir. 1987).

In arriving at these findings and recommendations, the Court carefully reviewed and considered all arguments, points and authorities, declarations, exhibits, statements of undisputed facts and responses thereto, if any, objections, and other papers filed by the parties. Omission of reference to an argument, document, paper, or objection is not to be construed to the effect that this Court did not consider the argument, document, paper, or objection. This Court thoroughly reviewed and considered the evidence it deemed admissible, material, and appropriate.

## IV. Discussion

### A. Evidentiary Objections

Defendant generally objects to Plaintiff's statement of facts submitted in support of his opposition brief, which Defendant correctly notes is merely a re-allegation of the claims in Plaintiff's complaint. (ECF No. 63-2.) Defendant also objects to certain of Plaintiff's statements based on relevance, foundation, improper legal conclusion, speculation, best evidence rule, lay opinion, and hearsay. (*Id.*) Plaintiff did not file a response to Defendant's evidentiary objections.

It is not this Court's practice to rule on evidentiary matters individually in the context of summary judgment. *See Capitol Records, LLC v. BlueBeat, Inc.*, 765 F. Supp. 2d 1198, 1200 n.1 (C.D. Cal. 2010) (noting that it is often unnecessary and impractical for a court to methodically scrutinize and give a full analysis of each evidentiary objection on a motion for summary judgment). The Court notes that when evaluating a motion for summary judgment, a court

"cannot rely on irrelevant facts, and thus relevance objections are redundant." *Burch v. Regents of the Univ. of Cal.*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006) (explain that "objections to evidence on the grounds that it is irrelevant, speculative, and/or argumentative, or that it constitutes and improper legal conclusion are all duplicative of the summary judgment standard itself"). Unless otherwise noted, the Court overrules relevance and materiality objections at this stage, without prejudice. In addition, "statements … based on speculation or improper legal conclusions, or argumentative statements are not *facts* and likewise will not be considered on a motion for summary judgment." *Id.*; *see also Sandoval v. County of San Diego*, 985 F.3d 657, 665 (9th Cir. 2021) (concluding district court abused its discretion where it sustained "boilerplate one-word objections for 'relevance,' 'hearsay' and 'foundation'" in motion for summary judgment). The Court also declines to sustain the hearsay and foundational objections. *See US E.E.O.C. v. Placer ARC*, 114 F. Supp. 3d 1048, 1052 (E.D. Cal. 2015) (declining to sustain hearsay objections and noting that "[o]n summary judgment, 'objections to the form in which the evidence is presented are particularly misguided where, as here, they target the non-moving party's evidence'"); *Weatherby Locums Inc. v. Kern Cnty. Hosp. Auth.*, No. 1:20-cv-00949 JLT CDB, 2024 WL 4729057, at *5 (E.D. Cal. Nov. 8, 2024) (overruling foundation objections and noting "[t]o the extent any declarant makes statements regarding matters of which he or she does not have personal knowledge, the Court does not rely on statements in resolving... [the motion], Moreover, any other foundational issues can be cured at trial...").

In the analysis below, the Court relies only upon any evidence that may be presented in an admissible form at trial in evaluating the merits of the motion for summary judgment. *See* Fed. R. Civ. P. 56(c)(2); *see also Sali Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1005 (9th Cir. 2018) ("the court must review the evidence in light of what would be admissible before either the court or jury" [citation omitted]); *Burch*, 433 F. Supp. 2d at 1119-1120 (even if evidence is presented in a form that is currently inadmissible, it may be considered on a motion for summary judgment so long as the admissibility defects could be cured at trial).

**B. Defendant's Statement of Undisputed Material Facts ("UMF")**[3]

1. Before his incarceration, Serrano suffered a gunshot wound to his knee in 1985 whereupon he had surgery to remove splintered bone. He suffered chronic pain as a result of the gunshot wound. His leg was amputated in July 2019 while he was incarcerated. (ECF No. 55-5, Declaration of Corinna S. Arbiter ("Arbiter Decl."), Ex. A, Serrano Depo. 21:8-22:11, 25:5-27:8.)
2. Serrano was committed to the California Department of Corrections and Rehabilitation (CDCR) in the 1990s. He was released on parole at one point but was returned to custody. (ECF No. 55-7, Declaration of B. Ebert ("Ebert Decl.") ¶ 3(a) and Ex. C.)
3. In 2007, a custody officer observed Serrano passing a white object to another incarcerated person by shaking his hand. This individual was immediately stopped, and the custody officer removed a pill wrapped in paper from his hand. A nurse identified the pill as 30mg of morphine sulphate, the same type of pill that Serrano was prescribed. Serrano admitted to shaking the individual's hand at the hearing but denied passing the morphine. CDCR found Serrano guilty of improperly distributing his prescribed morphine and ordered a year of mandatory drug testing. (*Id.* ¶ 3(b) and Ex. D.)
4. In 2008, a doctor performed a total right knee replacement on Serrano. Serrano underwent a procedure to revise the knee replacement in 2009 or 2010.[4] (Ex. A to Arbiter Decl., Serrano Depo. 23:19-22, 24:12-22.)
5. In March 2013, a custody officer ordered that Serrano be tested for alcohol or

[3] *See* Defendant's Statement of Undisputed Material Facts in Support of Defendant Rudas's Motion for Summary Judgment (ECF No. 55-3), and Plaintiff's Opposition (ECF No. 62 at 90-106). Unless otherwise indicated, disputed and immaterial facts are omitted from this statement, and relevant objections are overruled.

[4] Plaintiff disputes UMF 4, but he testified in his deposition that he had a total knee replacement in 2008, and a revision in 2010. (Ex. A to Arbiter Decl., Serrano Depo. 23:19-22, 24:12-22.) UMF 4 is therefore undisputed.

controlled substance use. A urine sample was collected from Serrano and tested by the San Diego Reference Laboratory. The sample tested positive for morphine. CDCR determined that Serrano was guilty of use of a controlled substance based on the evidence. (Ebert Decl. ¶ 3(c) and Ex. E.)

6. In September, October, and November 2014, medical records reflect that Serrano sought and received morphine for his knee pain three times. (ECF No. 55-6, Declaration of R. Rudas ("Rudas Decl.") ¶ 6(a)-(c) and Exs. I, J, and K.)

7. Serrano arrived at Mule Creek State Prison on February 26, 2015. (Ebert Decl. ¶ 3(a) and Ex. C.)

8. In March 2015, Serrano requested that his pain medication be renewed. On April 25, 2015, Serrano requested that his morphine prescription –set to expire on April 28, 2015—be renewed because of pain in his right knee. (Rudas Decl. ¶ 6(d) and Exs. L, M.)

9. On November 1, 2015, before undergoing a body search, Serrano told a custody officer that he had a "point" in his front shirt pocket. The officer retrieved a syringe from Serrano's front shirt pocket. The case was referred to the Amador County District Attorney's Office for prosecution and accepted. Serrano was found guilty of possession of drug paraphernalia and more time was added to his sentence. (Ebert Decl. ¶ 3, Exs. F, G. and H.)

10. On June 7, 2016, Serrano saw nondefendant Dr. Lee for several medical issues. Dr. Lee noted that Serrano had chronic right knee pain with a history of a complex hinged total knee replacement in 2008, was seen by an orthopedic surgeon annually, and received the opiate pain medication morphine sulphate extended release 15 mg twice daily. (ECF No. 55-8, Declaration of B. Feinberg, M.D. ("Feinberg Decl.") ¶ 9 and Ex. BB.)

11. On June 18, 2016, LVN Abimbola completed an interdisciplinary progress note documenting that as she was distributing medications, "Serrano attempted to hide his

morphine sulfate 15 mg under his tongue to make it appear as if he swallowed pill."[5] The correctional term of art for this is cheeking, whereby an incarcerated individual attempts to hide rather than swallow a medication they were given, often between the cheek and gums. Most commonly this is done with a narcotic, for some later illicit use such as sale to another or to take for themselves in a different fashion that gives a more gratifying high. For example, morphine sulfate extended release is designed to release slowly over 8 to 12 hours. However, if that medication were to instead be ground and snorted or injected, the time-released mechanism would be destroyed causing the entire does to be released at once. LVN Abimbola documented informing Plaintiff that his physician would be notified. (*Id.* ¶ 10 and Ex. BB.)

12. On August 26, 2016, Serrano submitted a health care grievance alleging that his prescription for morphine/methadone was not renewed and requested that it be reinstated. The Institution Response advised that the prescription had been discontinued because Serrano was "cheeking" the medication. (ECF No.55-9, Declaration of K. Martin ¶¶ 1-7 and Ex. DD.)

13. On September 26, 2016, Serrano saw nondefendant Dr. Wong to appeal a decision by nondefendant Dr. Vaughn on August 18, 2016 to discontinue the morphine due to cheeking. Serrano was angry, and threatened to file a lawsuit naming Dr. Wong amongst others. Dr. Wong informed Serrano "that cheeking, hoarding, selling, or diversion of narcotic is prohibited and resulted in discontinuation of his morphine. Advised the patient to seek drug counseling." (Feinberg Decl. ¶ 11 and Ex. BB.)

14. On March 15, 2018, Serrano saw nondefendant Dr. Matharu for follow-up of right knee pain after a computer comography scan of the right knee performed on March 7, 2018 was notable for loosening of the hardware in Serrano's knee. An orthopedic surgery consultation was requested. Dr. Matharu noted that Plaintiff was now having

[5] Plaintiff disputes UMF 11, asserting that he "[d]id not attempt to hide his morphine sulfate 15 mg under his tongue." (ECF No. 62 at 92.) Relevant here, Plaintiff disputes how he was hiding the morphine, not that he was hiding it. Thus, it is undisputed that Plaintiff attempted to hide his morphine sulfate.

difficulty bearing weight and was temporarily using a walker. Dr. Matharu opined that "given evidence of hardware malfunction and impaired functional status reasonable for short course of narcotics while awaiting specialist consultation (pending)." Dr. Matharu prescribed Tylenol # 3, which is Tylenol with the opiate codeine added, to take 1 tablet twice daily for 30 days as needed for pain.[6] (*Id.* ¶ 12 and Ex. BB.)

15. On May 14, 2018, Serrano saw Dr. Matharu for an interval follow-up. Dr. Matharu documented that Serrano's chronic pain syndrome was "reasonably at goal" on a nonnarcotic pain regimen that consisted of over-the-counter Tylenol, the nonsteroidal anti-inflammatory drug (NSAID) naproxen, and the topical analgesic capsaicin cream. Dr. Matharu noted that they were awaiting the pending orthopedic surgery consultation. Dr. Matharu further documented instructing Serrano "to inform medical immediately should he experience worsening pain or exhibit neurologic deficit." There is nothing in the medical record to suggest that this occurred prior to their next appointment.[7] (*Id.* ¶ 13 and Ex. BB.)

16. Dr. Casey, the orthopedic specialist at San Joaquin General Hospital (SJGH) saw Serrano on June 12, 2018. (*Id.* ¶ 14 and Ex. BB.) Serrano testified that the doctor told him that:

> I was going to have to live with my chronic pain. There was nothing they could do about it. It was either fuse the knee to where my leg would stay straight but still have pain or amputate it above the knee. But those were the only two options I had to get rid of the – -- pain.

(Ex. A to Arbiter Decl., Serrano Depo. 30:1-11.)

17. Serrano saw Dr. Matharu on June 15, 2018. Dr. Matharu noted that an orthopedic specialist at San Joaquin General Hospital saw Serrano on June 12, 2018. Serrano

---

[6] Plaintiff disputes UMF 14, but cites allegations in his complaint unrelated to events on March 15, 2018. (*See* ECF No. 2 at 93-94.) UMF 14 is therefore undisputed.

[7] Plaintiff disputes UMF 15 but cites allegations in his complaint unrelated to events on May 14, 2018. (*See* ECF No. 62 at 93-94.) UMF 15 is therefore undisputed.

advised that the maximum doses of various medications were not significantly reducing the pain. Dr. Matharu noted that after a "prolonged informed discussion of associated risks/benefits of narcotic therapy (pain contract signed)" he prescribed additional morphine to Serrano with a stop date of July 15, 2018. He renewed the prescription two more times with an end date of August 14, 2018.[8] (Rudas Decl. ¶ 8 and Ex. O; Feinberg Decl. ¶¶ 15-16 and Ex. BB.)

18. In August 2018, Serrano was assigned to Dr. Rudas's patient panel. Dr. Rudas saw Serrano on August 2, 2018, for a dermatology issue. Neither knee pain nor pain medication were discussed.[9] (Rudas Decl. ¶ 9; Feinberg Decl. ¶ 18 and Ex. BB.)

19. In the first two weeks of August 2018, Serrano went to the medication line for his dose of morphine. He was told by the nurse distributing medication that his new doctor discontinued the prescription.[10]

20. Dr. Rudas has been licensed in California for 47 years, is certified by the American Board of Family Medicine, and has not had any complaints submitted to the medical board in his years of practice. Dr. Rudas maintains his license by, among other things, obtaining 50 hours of approved Continuing Medical Education during each biennial renewal cycle.[11] (Rudas Decl. ¶¶ 2-3.)

---

[8] Plaintiff disputes UMF 17. Plaintiff states, "On June 15, 2018, he reported to Dr. Matharu that he was unable to sleep and could not perform his daily activities…They discussed Dr. Casey's findings and Dr. Matharu advised Plaintiff he would prescribe pain medication. . . . (morphine)." (ECF No. 62 at 94.) Plaintiff's statement does not raise a genuine dispute of material fact, and affirms that Plaintiff saw Dr. Matharu on June 15, 2018, and that Dr. Matharu prescribed additional morphine.

[9] Plaintiff disputes UMF 18, stating he had "no need to discuss knee pain or pain medication because [he] was being treated for his knee pain and was receiving helpful pain medication." (ECF N. 62 at 95.) UMF 18 is therefore deemed undisputed.

[10] Plaintiff disputes UMF 19, arguing that in the first two weeks of August that "[t]here was no tapering of the medication (morphine) which that time put Plaintiff life in danger and left Plaintiff in more pain than before." (ECF No. 62 at 95.) Plaintiff's argument does not raise a genuine dispute of material fact.

[11] Plaintiff purports to dispute UMF 20, but he provides no evidence to raise a genuine dispute regarding Dr. Rudas' licensing, years of practice, or continuing medical education. (*See* ECF No.

21. Dr. Rudas received repeated instruction from his supervisors that opioids were not appropriate to treat chronic pain.[12] (*Id.* ¶ 3.)

22. Serrano submitted several CDCR Form 7362 Health Care Services Requests (7362) in mid-August, 2018, requesting to be seen by a doctor for severe pain in his knee. He was seen on August 20, 2018, by a nurse who co-consulted with Dr. Rudas about Serrano's request to renew the morphine prescription.

Dr. Rudas advised the nurse that the order would not be renewed because "opiates for chronic pain are not indicated."[13]

Serrano testified that Dr. Rudas told him that he was going to put him on something else less addicting.

Serrano further testified that Dr. Rudas prescribed other pain medication within a few days:

> Q At that point, did he prescribe some other drug for your pain?
> A I think he tried -- he did -- he did tell me he was going to put me on something else, something.· And I don't know if I should say it because I can't remember if it's exactly what he said.· Either it was something less addicting or something less -- I know it was in those words.· And to try that and see how it goes. I said okay. ·And there was that medication. We tried it, I think, for, like, two, three weeks. That didn't work. So he put me on something else.· I think it was like three times that he put me on different stuff to see if it would work.

(Rudas Decl., ¶¶ 10 -11 and Exs. Q, R; Ex. A to Arbiter Decl., Serrano Depo.,

62 at 95.) UMF 20 is therefore undisputed.

[12] Plaintiff purports to dispute UMF 21. He states, "Plaintiff believe that it was Dr. Rudas supervisors opinion and not his own that made him stop plaintiff medication for pain." (ECF No. 62 at 95. Plaintiff's belief does not raise a genuine dispute of material fact. UMF 21 is therefore deemed undisputed.

[13] Plaintiff disputes UMF 22. Plaintiff denies that Dr. Rudas stated that opiates for chronic pain are not indicated. Plaintiff asserts that "what was told to plaintiff is that there is a new sheriff in town and plaintiff will not be receiving any pain medication." (ECF No. 62 at 96.) Plaintiff's assertion does not raise a genuine dispute of material fact as to whether Dr. Rudas advised the nurse that the order would not be renewed because opiates for chronic pain are not indicated. Further, the relevant progress notes for August 20, 2018 state: "Opiates for chronic pain is not indicated." (ECF No. 55-6, Ex. R to Declaration of R. Rudas.) UMF 22 is therefore deemed undisputed.

31:11-33:10.)

23. On September 18, 2018, Dr. Rudas saw Serrano for an appointment and reviewed all of Serrano's active chronic medical conditions.[14] Regarding Serrano's chronic right knee pain, Dr. Rudas reviewed Serrano's relevant knee history, performed a physical examination, and documented:

> The patient now wants to highly consider a right above-the-knee amputation since he knows his pain will never go away otherwise.

Dr. Rudas noted that Serrano's knee was diffusely tender with no effusion. Dr. Rudas continued Naproxen for pain and referred Serrano for an orthopedic consult. The request was denied by a supervising doctor based on a need more information. (Rudas Decl. ¶ 12, and Ex. S; Feinberg Decl. ¶ 23, and Ex. BB.)

24. On October 15, 2018, Dr. Rudas saw Serrano. Serrano reported he was now having difficulty showering due to falling in the shower, as well as difficulty making it to the chow line with his walker. On physical exam, Dr. Rudas noted that the Serrano was not able to ambulate at all without the walker, and that he had almost no muscle mass of the right thigh or leg. Serrano's right knee was tender but not swollen. Dr. Rudas opined that Serrano "has total loss of function of his right lower extremity wherein **he can not fully perform his ADLs.**" Dr. Rudas submitted paperwork that Serrano be provided with cell-feeding for 6- months, so he would not be required to ambulate to the chow line. Dr. Rudas also resubmitted paperwork for an orthopedic consultation, documenting that "since his problem is so complicated, and SJGH Orthopedic consultant is even considering an [above-the-knee] amputation, it would be best to

---

[14] Plaintiff disputes UMF 23, asserting that September 2018 "was the first time Dr. Rudas performed a physical examination that he finished without asking Plaintiff to leave." (ECF No. 62 at 96.) Plaintiff's assertion is unrelated to UMF 23 and does not raise a genuine dispute of material fact. Plaintiff also alleges that "After many health care requests, Plaintiff was seen by Dr. Rudas . . . . Plaintiff advised Rudas of his severe pain, inability to sleep, swelling, and inability to complete his daily activities." (*Id.* at 97.) Plaintiff's allegations do not raise a genuine dispute of material fact related to UMF 23.

refer this complex case to UC Davis orthopedics." This request was approved by Dr. Smith on October 23, 2018.[15] (Feinberg Decl. ¶ 24, and Ex. BB.)

25. On October 23, 2018, Serrano saw Dr. Rudas for follow-up of his chronic right knee pain. Dr. Rudas opined that "with his chronic pain condition opiates are not a safe option," and noted that other alternative chronic pain treatments already tried without success by Serrano included Elavil, Venlafaxine, and Trileptal. Dr. Rudas started Serrano on Cymbalta, a medication FDA approved for several types of chronic pain indications including chronic musculoskeletal pain, to take 60mg once a day. Dr. Rudas noted that the referral to UC Davis orthopedic surgery department had been approved and the appointment was pending.[16]

On the same day, pertaining to the UC Davis referral, another doctor at Mule Creek State Prison determined to send Serrano back to Dr. Casey at SJGH. (Feinberg Decl. ¶¶ 25, 26, and Ex. BB.)

26. On November 7, 2018, Dr. Rudas saw Serrano. He noted right knee tenderness, no effusion and that the right leg was profoundly atrophic with almost no muscle mass. Serrano reported to Dr. Rudas that the Cymbalta prescription had no effect on his chronic pain and made him anxious. Dr. Rudas documented that, "with patient's consent," he would place Serrano on a trial of 30 mg a day of Cymbalta. Dr. Rudas was unaware that Dr. Smith had given directions for the orthopedics follow-up to be

---

[15] Plaintiff disputes UMF 24, citing allegations in his verified complaint, including that "Plaintiff advised Rudas that if he did not receive "helpful medical treatment" or "helpful medication," he intended to file a grievance or appeal against Defendant Rudas." (ECF No. 62 at 97.) Plaintiff's allegations do not raise a genuine dispute of material fact.

[16] Plaintiff disputes UMF 25, citing allegations in his verified complaint, including that Defendant Rudas refused to prescribe pain medication or additional treatment. (ECF No. 62 at 98.) However, Plaintiff's medical records reflect that Dr. Rudas started Plaintiff on Cymbalta and noted the UC Davis orthopedic surgery department referral was pending. (Feinberg Decl. ¶ 25 and Ex. BB at 56.) Subsequent medical records reflect that Plaintiff had been "placed on a trial of Cymbalta 60mg qday, but he had agitation side effects on that dose, so he only took it 3 days." (*Id.* at 59.) Plaintiff does not cite conflicting evidence, nor does he demonstrate that the evidence relied upon by Defendant is inadmissible.

back at SJGH—with the specialist who told Serrano that he could fuse the knee or amputate the leg—documenting that they were waiting for the appointment at UC Davis that had "been approved."[17] (Rudas Decl. ¶ 14 and Ex. V; Feinberg Decl. ¶ 27 and Ex. BB.)

27. On November 20, 2018, Serrano signed a refusal to be transferred to his orthopedic surgery evaluation at SJGH with Dr. Casey. In contemporaneous documentation from a nurse, Serrano stated that it was because he understood that he was supposed to go to UC Davis not back to SJGH. (Feinberg Decl. ¶ 28 and Ex. BB.)

28. On December 3, 2018, Dr. Rudas saw Serrano to discuss Serrano's refusal of the appointment at SJGH with Dr. Casey. Dr. Rudas noted that he had requested a different specialist. He further noted that Serrano requested a referral to an outpatient housing unit because he was having difficultly standing and needed assistance with activities of daily living. Dr. Rudas told Serrano he would see what he could do about getting Serrano to another orthopedic specialist.[18] (Rudas Decl. ¶ 15 and Ex. W; Feinberg Decl. ¶ 29 and Ex. BB.)

29. On December 5, 2018, Dr. Rudas saw Serrano to follow up on his pain medication. Dr. Rudas noted that he saw no effusion on the leg, that Serrano's status had been changed to medical outpatient housing unit status to facilitate transfer to a prison that could better assist with his needs.[19] (Rudas Decl. ¶ 16 and Ex. X; Feinberg Decl. ¶ 30

---

[17] Plaintiff disputes UMF 26, citing allegations in his verified complaint, including that "despite seeing that [Plaintiff's] leg was swollen, Rudas refused to prescribe any helpful pain medication or medical treatment." (ECF No. 62 at 98.) However, Plaintiff's medical records reflect that "[w]ith [Plaintiff's] consent will place on trial of Cymbalta 30mg qday." (Ex. BB to Feinberg Decl. at 59.) Plaintiff does not cite conflicting evidence, nor does he demonstrate the evidence relied upon by Defendant is inadmissible.

[18] Plaintiff disputes UMF 28, citing allegations in his complaint. (ECF No. 62 at 99.) Plaintiff does not cite conflicting evidence, nor does he demonstrate the evidence relied upon by Defendant, namely Plaintiff's medical record, is inadmissible.

[19] Plaintiff disputes UMF 29, alleging "In December Dr. Rudas saw Serrano. Plaintiff leg was swollen, and he was in severe pain." (ECF No. 62 at 99.) Plaintiff's statement does not raise a genuine dispute of material fact.

and Ex. BB.)

30. On December 7, 2018, Dr. Giza, Medical Director of the UC Davis orthopedics clinic, sent a letter to Dr. Smith declining the referral of Serrano due to "a shortage of appointment slots with our specialist who treat that particular condition at this time." (Feinberg Decl. ¶ 31 and Ex. BB.)

31. On December 28, 2018, Dr. Rudas saw Serrano for the last time. Dr. Rudas learned that University of California-Davis declined a consult with Serrano. Dr. Rudas noted that Serrano had intractable knee pain, but no effusion. Dr. Rudas referred Serrano to Highland General Hospital Orthopedics. (Rudas Decl. ¶ 17 and Ex. Y; Feinberg Decl. ¶ 32 and Ex. BB.)

32. On February 4, 2019, Serrano was transferred away from Mule Creek to another prison. Dr. Rudas did not see Serrano after their last encounter on December 28, 2018. The receiving institution provided an assessment of Serrano's health, and it did not show signs of infection in Serrano's right leg. (Rudas Decl. ¶ 18 and Ex. Z; Ebert Decl. ¶ 3(a) and Ex. C.)

33. On July 15, 2019, Serrano saw Dr. De La Sierra at Pleasant Valley State Prison complaining of 5 to 6 days of swelling and increased pain of his right lower extremity. Serrano stated that the "swelling and pain came out of nowhere, woke up unable to bear any weight on right lower extremity." Serrano also reported feeling feverish for one week. On exam, Serrano had diffuse swelling and increased warmth to his right knee. Dr. De La Sierra expressed concern that Serrano might have a septic joint and had him transferred by ambulance to Mercy Hospital of Bakersfield.

In the early morning of July 16, 2019, Dr. Burchett in the emergency department at Mercy Hospital Bakersfield documented that Serrano had presented there with six days of knee pain and swelling, and that an arthrocentesis had confirmed a septic knee. Dr. Burchett further documented that they began "looking for a tertiary care center to accept this complicated patient," and that ultimately UC San Francisco Medical Center accepted him for transfer. During his hospital stay, his right leg was

amputated. (Feinberg Decl. ¶¶ 34-35 and Ex. BB; Ex. A to Arbiter Decl., Serrano Depo. 48:20-49:22.)

34. Serrano acknowledges that the alleged failure of Dr. Rudas to prescribe morphine is not connected to an infection in his leg. (Ex. A to Arbiter Decl., Serrano Depo. 46:7-17.)

35. In August 2020, during a visit with his PCP, Serrano advised he had been "using [drugs] for decades . . . heroin mostly, and other opioids . . . since age 15." (Feinberg Decl. ¶ 36 and Ex. BB.)

36. In response to a Request for Admission (RFA) seeking that Serrano admit that he had received a letter from the institution advising him that his morphine prescription would not be renewed because he was abusing the prescription. Serrano refused to respond based on his rights under the Fifth Amendment of the United States Constitution. (Arbiter Decl. ¶ 5 and Exs. B, B-1.)

37. In or around 2024, Serrano graduated from a palliative care training where he learned to assist people with transfers from beds and changing bedding. He was not trained in medications. Years ago, he was a caretaker for one person. He has not had any formal medical training. (Ex. A to Arbiter Decl., Serrano Depo. 13:12-15:14.)

38. While in past years it was not unusual for patients to be prescribed opioids such as morphine for chronic musculoskeletal pain. Starting in March 2016, The Centers for Disease Control and Prevention promulgated guidelines which strongly warn against the use of opiates in the treatment of chronic non-cancer pain. Current medical best practices disfavor the use of opioids for chronic non-cancer pain, to minimize the risks of opioid dependence, addiction, and overdose. (Feinberg Decl. ¶ 37.)

39. A study entitled "*Analysis of 2016 Inmate Death Reviews in the California Correctional Healthcare System* " (Oct. 8, 2017) (authored by Kent Imai, MD), documents that the death rate from drug overdoses—most of which relate to abuse of opioids—had actually increased over the previous decade, and the death rate from drug overdoses in California's prisons was very high. Dr. Imai's report explained the

disproportionate impact on California prisons and the campaign to end it as follows:

> It should be recognized that this problem mirrors what is known to be happening in American society. The so-called opioid epidemic has resulted in similar increases in opioid use, abuse, addiction, and death by overdose. The Center for Disease Control (CDC) reported in January 2016, that drug overdose death rates had more than doubled from 2000 to 2014. from 6.2 to 14.7/100,000. The CCHCS has experienced a similar rise in drug overdose death rates over the past eleven years, with rates ranging from a low of 5.3/100,000 in 2007 to a high of 22.5/100,000 in 2016. The national concern triggered by this problem has produced a campaign to educate the public about the dangers of addiction and overdose which accompany narcotic prescriptions for chronic non-cancer pain, and to educate prescribing physicians about safer opioid prescribing practices and encouraging the use of buprenorphine and naloxone to make opioid narcotic use less prone to death by overdose.

(*Id.* ¶ 38.)

40. California Correctional Health Care Services (CCHCS) used the *Imai* study and CDC guidelines to develop the California Correctional Health Care Services Care Guide. The guide reflects the disfavor of opiates in the treatment of chronic non-cancer pain in California prisons. The guidelines also contain recommendations for discontinuation in cases where benefits are outweighed by risk, or where psychiatric instability, past substance abuse, or suspected abuse or diversion is present. (*Id.* ¶ 39.)

41. On October 11, 2018, J. Clark Kelso, Receiver for medical care within CDCR appointed pursuant to the *Plata v. Newsom* class action, issued a memorandum entitled "Treatment to Reduce the Burden of Disease and Deaths from Opioid Use Disorder." The memorandum directed an approach aimed at "reducing opioid overdose deaths within CDCR" that precluded using opioids for pain relief in circumstances where other treatment options were available. The memorandum also directed the development of a Medication Assisted Treatment (MAT) program for the treatment of Opioid Use Disorders. (*Id.* ¶ 40.)

42. Dr. Rudas is familiar with the CDC guidelines, the study by Dr. Imai, the CCHCS Care Guide, and the October 2018 memo issued by the *Plata* Receiver, Mr. Kelso. (Rudas Decl. ¶ 3.)

43. Based on Dr. Rudas's experience working at Mule Creek State Prison with incarcerated persons, and his medical training, it was his professional opinion that morphine was inappropriate to treat non-cancer chronic pain before more conservative measures were attempted because of its addicting nature and it was his practice to prescribe non-addicting pain medication for chronic pain. (*Id.* ¶¶ 3, 21.)

44. Dr. Feinberg is a physician licensed by and in good standing with the State of California. He obtained his medical degree from the University of California at San Francisco School of Medicine in 1994. He completed his internship and residency in internal medicine in 1997 at Baylor College of Medicine in Houston, Texas. He is a Diplomate of the American Board of Internal Medicine and has more than 25 years of experience in the field of internal medicine. He is currently employed by California Correctional Health Care Services (CCHCS) and serves as the Chief Medical Consultant for the CCHCS Office of Legal Affairs, a position he has held since February 2017. His current duties include reviewing medical records and medical procedures pertinent to medical treatment in a correctional setting. He has personally cared for, and supervised the care of, many thousands of patients for conditions commonly treated in the correctional care setting, including in regard to acute or chronic pain complaints.

Prior to his current position, Dr. Feinberg served as a full-time primary care physician in two California prisons, Folsom State Prison and Mule Creek State Prison, from January 2010 to January 2017. Before coming to CCHCS, he served as a physician team leader and staff physician at Kaiser Permanente for twelve years. He supervised a module of ten physicians, while also providing the full range of primary care services to his own adult patients. He was also responsible for supervising and scheduling physicians and resolving staff disputes and patient complaints.

Dr. Feinberg is familiar with the standard of care and skill ordinarily exercised by reputable members of the medical profession providing medical care to patients in California Department of Corrections and Rehabilitation's (CDCR) prisons. He is

familiar with the practices, policies, and procedures promulgated by CDCR and by CCHCS regarding the delivery of health care within CDCR's prisons. (Feinberg Decl. ¶¶ 2-4 and Ex. AA.)

45. Serrano was offered timely, adequate, and appropriate medical attention and care, and Dr. Rudas's course of treatment offered was medically acceptable. In the opinion of Dr. Rudas's expert, Serrano's claim that Dr. Rudas was deliberately indifferent to his serious medical needs by denying his request for morphine is not supported by the medical record. Dr. Rudas exercised good medical judgment, comporting with nationally recognized standards of care for pain management, when he acted in Serrano's best interests by not acquiescing to his demands for opioid pain medication for his chronic noncancer pain.

With the development of the MAT program, Serrano has benefited from Suboxone to treat his long-standing opioid addiction. (Feinberg Decl. ¶ 41.)

46. Serrano's allegation that his knee was infected while under Dr. Rudas's care is not in accord with the evidence. Dr. Casey, the SJGH specialist noted in his evaluation on June 12, 2018, that Serrano's knee was aseptic. When Serrano did develop a septic joint, in July 2019, the symptoms began suddenly approximately one week prior and more than six months after his last appointment with Dr. Rudas. (Feinberg, Decl., ¶ 41, and Ex. BB, DEF007.)

**C. Parties' Positions**

Defendant argues that Dr. Rudas was not deliberately indifferent to Serrano's pain because he regularly evaluated Serrano, prescribed appropriate medication, and course corrected when needed. Dr. Rudas appropriately treated Serrano's chronic pain using medically acceptable pain reduction measures. Specifically, it was Dr. Rudas's practice not to prescribe opioids for chronic pain before exhausting non-addicting prescriptions. When Serrano became his patient in August 2018, Dr. Rudas discontinued the short-term prescription for morphine based on the evolving standard of care for treatment of chronic pain. Over the six months that Serrano was Dr. Rudas's patient, Dr. Rudas regularly evaluated him. He replaced the morphine with non-

addicting medication, and when Serrano complained of side effects, Dr. Rudas worked to alleviate them. Defendant further argues that Dr. Rudas's course of treatment was medically acceptable. Dr. Rudas prescribed formulary medication and then adjusted those prescriptions when indicated. When Serrano was no longer able to perform activities of daily living because of knee pain, Dr. Rudas referred Serrano to an OHU and made referrals to other specialists to ensure Serrano received appropriate care. Additionally, Dr. Feinberg confirmed that Serrano was offered timely, adequate, and appropriate medical attention and care and that the course of treatment was medically acceptable. Defendant contends that there is no probative evidence showing that Dr. Rudas's course of treatment was medically unacceptable under the circumstances. Defendant also contends that the undisputed evidence shows that Dr. Rudas provided extensive treatment by regularly seeing, treating, and evaluating Serrano, as well as requesting referrals to specialist orthopedists, and prescribing various non-addictive medications. Finally, Defendant contends Dr. Rudas is entitled to qualified immunity.

In opposition, Serrano argues that Dr. Rudas was deliberately indifferent to his serious medical needs and pain by (1) discontinuing the prescription medication morphine, (2) not weaning or tapering Serrano off of his morphine, and (3) denying, delaying, and intentionally interfering with needed medical treatment. Serrano contends that the evidence is clear that Dr. Rudas knowingly and willingly denied Serrano helpful medication (morphine) and medical treatment because his supervisors wanted him to deny Serrano's helpful medication (morphine). Serrano also contends that the evidence and record will show that before and after Dr. Rudas's non-medical treatment, Serrano was receiving the helpful medication morphine and very helpful medical treatment. Serrano claims that Dr. Rudas knew the extent of Serrano's pain, knew the course of treatment was largely ineffective, and declined to do anything more to attempt to improve Serrano's situation. Before Serrano was in Dr. Rudas's care, he received morphine for serious and chronic pain and after he was in Dr. Rudas's care, he received morphine for his serious chronic pain. The only reason Serrano did not receive morphine while in Dr. Rudas's care is because his supervisors wanted him to deny Serrano helpful medication (morphine). Serrano further argues that Dr. Rudas knew Serrano had a significant injury in the right knee, and

Dr. Rudas himself stated that Serrano had severe right knee pain from multiple failed right knee replacement procedures. Dr. Rudas also stated that Serrano had severe chronic pain, and was having extreme difficulty, falling in the shower, having difficulty making it to the chow hall, and could not complete his daily activities. Serrano asserts that Dr. Rudas's answer was "to not taper Plaintiff off his morphine but just to take it," leaving Serrano in more pain, giving Serrano medications that did not work, and giving Serrano medications that he knew would give side effects. (ECF No. 62 at 12.) Serrano believes that one of the reasons that Dr. Rudas took the course of treatment he did is because Serrano told Dr. Rudas that he was going to file an inmate appeal against him. Serrano additionally alleges that the course of treatment prescribed by Dr. Rudas to manage Serrano's chronic severe leg pain was largely ineffective. Serrano's requests for sufficient medication, including specific requests for helpful pain medication or medical treatment, were repeatedly denied by Dr. Rudas even though he knew that Serrano had previously been prescribed morphine. Serrano argues that the Court should find that Dr. Rudas's overall delay in prescribing Serrano with stronger medication beyond over-the-counter medications and topical creams to address his pain was medically unacceptable.

Defendant replies that Serrano provides no evidence to support the medical deliberate indifference claim, relying on the allegations in his complaint, which is not evidence that overcomes Dr. Rudas's undisputed facts. Serrano's claim is nothing more than his disagreement with Dr. Rudas's treatment decision. Dr. Rudas used good medical judgment, consistent with applicable medical standards, to discontinue Serrano's morphine prescription and prescribe other non-narcotic pain medication over the course of four months. Serrano also is barred from claiming Dr. Rudas did not wean him off of morphine because he raised it for the first time to oppose summary judgment. Even if entertained by the Court, Serrano's argument that Dr. Rudas should have gradually weaned him off of morphine amounts to nothing more than a difference of medical opinion. Serrano is not a medical professional, but even if he were, his disagreement regarding the course of treatment does not demonstrate medical deliberate indifference. Additionally, Dr. Feinberg opined that Dr. Rudas offered timely, adequate, and appropriate medical attention and care, and his course of treatment offered was medically acceptable.

Defendant contends that Dr. Rudas continually offered pain alternatives, monitored Serrano's health care needs, and addressed Serrano's assistive needs. Additionally, Defendant argues that other doctors' morphine prescriptions for Serrano do not establish medical deliberate indifference. That doctors before or after Dr. Rudas prescribed Serrano morphine merely establishes a difference of opinion between medical professionals. Further, Serrano was not immediately prescribed morphine after his transfer from Mule Creek State Prison in February 2019. Defendant reasserts that Dr. Rudas is entitled to qualified immunity because he did not violate Serrano's rights under the Eighth Amendment.

**D. Analysis**

**1. Eighth Amendment – Deliberate Indifference**

A prisoner's claim of inadequate medical care constitutes cruel and unusual punishment in violation of the Eighth Amendment where the mistreatment rises to the level of "deliberate indifference to serious medical needs." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). The two-part test for deliberate indifference requires Plaintiff to show (1) "a 'serious medical need' by demonstrating that failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain,'" and (2) "the defendant's response to the need was deliberately indifferent." *Jett*, 439 F.3d at 1096.

A defendant does not act in a deliberately indifferent manner unless the defendant "knows of and disregards an excessive risk to inmate health or safety." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). "Deliberate indifference is a high legal standard," *Simmons v. Navajo Cty. Ariz.*, 609 F.3d 1011, 1019 (9th Cir. 2010); *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004), and is shown where there was "a purposeful act or failure to respond to a prisoner's pain or possible medical need" and the indifference caused harm. *Jett*, 439 F.3d at 1096. In applying this standard, the Ninth Circuit has held that before it can be said that a prisoner's civil rights have been abridged, "the indifference to his medical needs must be substantial. Mere 'indifference,' 'negligence,' or 'medical malpractice' will not support this cause of action." *Broughton v. Cutter Labs.*, 622 F.2d 458, 460 (9th Cir. 1980) (citing *Estelle*, 429 U.S. at 105–06). Even gross

negligence is insufficient to establish deliberate indifference to serious medical needs. *See Wood v. Housewright*, 900 F.2d 1332, 1334 (9th Cir. 1990).

Further, a "difference of opinion between a physician and the prisoner—or between medical professionals—concerning what medical care is appropriate does not amount to deliberate indifference." *Snow v. McDaniel*, 681 F.3d 978, 987 (9th Cir. 2012) (citing *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989)), overruled in part on other grounds, *Peralta v. Dillard*, 744 F.3d 1076, 1082–83 (9th Cir. 2014); *Wilhelm v. Rotman*, 680 F.3d 1113, 1122–23 (9th Cir. 2012) (citing *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1986)). Rather, Plaintiff "must show that the course of treatment the doctors chose was medically unacceptable under the circumstances and that the defendants chose this course in conscious disregard of an excessive risk to [his] health." *Snow*, 681 F.3d at 988 (citing *Jackson*, 90 F.3d at 332) (internal quotation marks omitted).

<u>Serious Medical Need</u>

The parties do not dispute that Plaintiff had a serious medical need in the form of chronic pain. Rather, they dispute whether Defendant Dr. Rudas was deliberately indifferent to that need.

<u>Deliberate Indifference</u>

The undisputed evidence demonstrates that Dr. Rudas was not deliberately indifferent to Serrano's serious medical need. When Serrano became Dr. Rudas's patient in August 2018, Dr. Rudas discontinued Serrano's short-term prescription for morphine based on his determination that opiates for chronic pain were not indicated. UMF 18, 22. It was Dr. Rudas's practice to prescribe non-addicting pain medication for chronic pain, and it was his professional opinion that morphine was inappropriate to treat non-cancer chronic pain before more conservative measures were attempted. UMF 43. Throughout the six months that Serrano was Dr. Rudas's patient, Dr. Rudas regularly evaluated Serrano, seeing him on at least 7 different occasions, prescribed Serrano pain medications other than morphine, such as Naproxen and Cymbalta, and adjusted those medications when needed to address their effectiveness or reported side effects. UMF 22-26, 28-29, 31. Additionally, Dr. Rudas referred Serrano for orthopedic consultations, including to UC Davis orthopedics. UMF 24, 25, 28, 31.

Serrano's opinion that Dr. Rudas should have prescribed morphine or provided other medical treatment is not sufficient to raise a genuine dispute of material fact. Serrano has not demonstrated that he qualifies as an expert witness to opine on the appropriate course of medical treatment. *See* Fed. R. Evid. 702. As Serrano is a lay witness, the only admissible evidence he can provide is limited to an opinion that is rationally based on his perception; that is helpful to clearly understanding his testimony or to determining a fact in issue; and is not based on scientific, technical, or other specialized knowledge within the scope of Rule 702, such as a medical opinion. *See* Fed. R. Evid. 701. In contrast, defense medical expert Dr. Feinberg opined that Serrano was offered timely, adequate, and appropriate medical attention and care, and Dr. Rudas's course of treatment was medically acceptable. UMF 45. Dr. Feinberg also opined that Dr. Rudas exercised good medical judgment, comporting with nationally recognized standards of care for pain management, when he acted in Serrano's best interests by not acquiescing to his demands for opioid pain medication for his chronic noncancer pain. UMF 45.

Serrano argues in his opposition that Dr. Rudas violated his constitutional rights by not weaning or tapering Plaintiff off of morphine. (ECF No. 62 at 7.) Serrano did not include this allegation in the operative complaint. (*See* ECF No. 1.) Even if properly alleged, however, Serrano's argument evinces a difference of medical opinion between Serrano and a medical professional, which does not amount to deliberate indifference to a serious medical need. *Snow*, 681 F.3d at 987; *Wilhelm*, 680 F.3d at 1122–23. Further, Dr. Feinberg, the medical expert, opined that Dr. Rudas's course of treatment was medically acceptable and that Dr. Rudas exercised good medical judgment, comporting with nationally recognized standards of care for pain management. UMF 45.

Serrano also argues that Dr. Rudas's deliberate indifference is evident because Serrano received morphine for serious and chronic pain before and after he was in Dr. Rudas's care. (ECF No. 62 at 8-9, 10-11, 14.) According to the record, Serrano received a short-term prescription for morphine prior to becoming Dr. Rudas's patient (UMF 17), Dr. Rudas terminated that prescription because opiates were not indicated (UMF 19, 22), and Serrano did not immediately receive morphine after his transfer from Mule Creek State Prison (UMF 32; Rudas

Decl. ¶ 18 and Ex. Z), receiving it two months later in April 2019 according to Serrano's own evidence (*see* ECF No. 62 at 182-89). At best, Serrano's argument suggests a difference of opinion between medical professionals, which does not amount to deliberate indifference. *Snow*, 681 F.3d at 987; *Wilhelm*, 680 F.3d at 1122–23.

Qualified Immunity

Defendant also argues that the Court should grant summary judgment on the basis of qualified immunity. However, the Court finds that this argument need not be reached based upon the above determination regarding the undisputed facts in this case.

**V. Conclusion and Recommendation**

For the reasons explained above, the Court finds that Defendant Rudas is entitled to summary judgment. Accordingly, it is HEREBY RECOMMENDED that:

1. Defendant's motion for summary judgment, (ECF No. 55), be granted; and
2. Judgment be entered in favor of Defendant and against Plaintiff.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(1). Within **fourteen (14) days** after being served with these Findings and Recommendations, the parties may file written objections with the court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." **Objections, if any, shall not exceed fifteen (15) pages. Any pages filed in excess of the 15-page limit may not be considered. Exhibits shall not be filed with objections, but they may be referenced by the document and page number. No new exhibits may be filed with objections.** The parties are advised that failure to file objections within the specified time may result in the waiver of the "right to challenge the magistrate's factual findings" on appeal. *Wilkerson v. Wheeler*, 772 F.3d 834, 838–39 (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated: **August 26, 2026**

/s/ Barbara A. McAuliffe
UNITED STATES MAGISTRATE JUDGE